UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS,

                       Plaintiff,

        -against-                                26-cv-0972 (LAK)

T-MOBILE USA INC,

                       Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| USDS SDNY |
| --- |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 3/30/2026 |

### MEMORANDUM OPINION GRANTING
### MOTION FOR A PRELIMINARY INJUNCTION

    Appearances:

        Marcella Ballard
        Roger A. Colaizzi
        VENABLE LLP
        *Attorneys for Plaintiff*

        Norman C. Simon
        Boaz I. Cohen
        HERBERT SMITH FREEHILLS KRAMER (US) LLP
        *Attorneys for Defendant*

LEWIS A. KAPLAN, *District Judge*.

        The cellular service industry is dominated by three large providers that fiercely compete to wrest customers from each other and to attract new ones. Price (or perceived price) is among the most important subjects of competition. Much provider advertising seeks to induce competitors' customers to "switch" to the advertising provider. It often does so by claiming that the advertiser's service is the cheapest.

2

A prime example – and the subject of this action – is T-Mobile's recently launched "Save Over $1,000" campaign. T-Mobile there claims that a Verizon[1] customer in certain circumstances can save over $1,000 per year by switching to T-Mobile.

Verizon challenges the campaign as false. Verizon asks the Court, in colloquial terms, to jam T-Mobile's signal because its "Save Over $1,000" ads, in Verizon's view, are based on a comparison of apples to oranges. According to Verizon, the "Save Over $1,000" claim is false on any fair comparison of the two companies' services. Verizon therefore seeks a preliminary injunction enjoining T-Mobile from continuing the campaign pending a trial and the final determination of this action.

***Facts***

*The Cellular Service Market*

There are three primary national providers of cellular service in the United States: Verizon, AT&T, and T-Mobile.[2] Competition among them is fierce.[3] As already noted, price often is a key consideration for customers.[4] Service providers aggressively compete to offer the best technology at the lowest price.[5]

---

[1] "Verizon" refers to Verizon Wireless, the actual name of which is Cellco Partnership.

[2] Clark Decl. (Dkt 14) ¶ 6; *see* Shankar Decl. (Dkt 24) ¶ 3.

[3] Clark Decl. (Dkt 14) ¶ 6; Shankar Decl. (Dkt 24) ¶ 4.

[4] Clark Decl. (Dkt 14) ¶ 7.

[5] *Id.*

The service providers price their offerings in different ways. As relevant here, Verizon allows its customers to customize their plans by adding optional "perks," which consist of ancillary services such as streaming.[6] These perks are bundled together and offered at a discount compared to what the selected services would cost individually.[7] For example, Verizon bundles Netflix and HBO, allowing a customer to add both services to his or her Verizon plan for an additional monthly cost that is less than what the customer might pay if he or she separately subscribed to Netflix and HBO.[8]

In contrast, T-Mobile includes in its plans certain benefits, such as a smaller, select set of streaming services, for no or little additional cost.[9] Another benefit relevant here is T-Mobile's T-Satellite service. T-Satellite relies on a network of low-orbit satellites to provide cellular service in parts of the United States that otherwise are unserved by terrestrial cellular networks.[10] Like regular cellular service, it supports messaging and most common app usage on most modern smartphones without requiring a user take any additional steps to set up or use the service.[11] T-

---

[6] *Id.* ¶ 10.

[7] *Id.*

[8] *Id.*

[9] Shankar Decl. (Dkt 24) ¶ 6.

[10] Lucht Decl. (Dkt 25) ¶ 3.

[11] *Id.* ¶¶ 6-9.

Satellite is available to customers of other service providers, including Verizon,[12] but few non-T-Mobile customers – or, at least, few Verizon customers – purchase it.[13]

*T-Mobile's "Save Up to 20%" Ad Campaign*

One way that service providers compete is through comparative advertising. From September 2024 until recently, T-Mobile ran an ad campaign claiming that customers could "save up to 20%" by switching from AT&T or Verizon to T-Mobile.[14] Verizon challenged that campaign before the Better Business Bureau's National Advertising Division ("NAD") and National Advertising Review Board ("NARB"),[15] both of which are self-regulatory bodies for reviewing the truth and accuracy of advertisements.[16]

On May 19, 2025, the NAD recommended that "T-Mobile discontinue the challenged claims" because (a) "consumers are not likely to expect the value of ancillary benefits to be included in a savings comparison," and (b) the terms that would enable a customer to save 20 percent were "not clear and conspicuous and further contradict[] the message of the broad comparative savings

---

[12] *See* Mar. 11, 2026 Prelim. Inj. Hr'g Tr. at 128:10-13.

[13] *See* Clark Decl. (Dkt 14) ¶ 26.

[14] *Id.* ¶ 12.

[15] *Id.* ¶ 13.

[16] *National Advertising Division (NAD)*, BBB Nat'l Programs, https://bbbprograms.org/programs/all-programs/national-advertising-division (last visited Mar. 23, 2026).

5

claim."[17]   The NARB on review upheld that recommendation in part because "many reasonable consumers will conclude that the promoted savings is based on the cost of the wireless plans without any adjustments for additional benefits."[18]   Despite T-Mobile's several subsequent modifications to the campaign, on January 22, 2026, the NARB found that T-Mobile still had "not made a bona fide attempt to" comply with aspects of its decision.[19]

*T-Mobile's "Save Over $1,000" Ad Campaign*

On January 7, 2026, T-Mobile announced a new ad campaign that would start on January 14, 2026.[20]   That campaign promotes T-Mobile's new, limited-time, promotional Better Value Plan and features claims that customers can save over $1,000 per year by switching from Verizon's Unlimited Ultimate Plan or AT&T's Unlimited Premium Plan to T-Mobile.[21]   It tells customers that they can "[s]ave on streaming, satellite, and more benefits the other big guys leave out."[22]   The fine print on the ads reads:

> "Check the math at T-Mobile.com/BetterValue.  *Savings vs. comparable plans at AT&T and Verizon* plus the costs of optional benefits; plan features and taxes and

---

[17]   Ballard Decl., Ex. E (Dkt 13-5) at 2-3.

[18]   *Id.*, Ex. F (Dkt 13-6) at 2-3.

[19]   *Id.*, Ex. G (Dkt 13-7) at 3.

[20]   Clark Decl. (Dkt 14) ¶ 15; J. Ex. 17, at 2.

[21]   Mar. 11, 2026 Prelim. Inj. Hr'g Tr. at 108:2-11; Clark Decl. (Dkt 14) ¶ 15; J. Ex. 17, at 2.

[22]   Simon Decl., Ex. 1 (Dkt 23-1) at 1; *accord* Ballard Decl., Ex. A-B (Dkts 13-1-2); Green Decl., Ex. A (Dkt 29-1); Clark Decl. (Dkt 14) ¶ 17.

6

fees vary . . . . With 3+ lines of Better Value Plan, 3+ new lines & 2 eligible ports or 3+ lines & 5+ years on T-Mobile postpaid plan required. Qualifying credit [required]."[23]

T-Mobile has used ads featuring these or substantially similar claims and disclosures on television, social media, and its website.[24]

Another way that T-Mobile promotes these claims is through an online calculator tool that visually displays the purported savings customers can achieve by switching from Verizon or AT&T to T-Mobile. As relevant here, the calculator shows the following purported monthly cost comparisons between T-Mobile's Better Value Plan and Verizon's Unlimited Ultimate Plan:

- Three mobile phone lines with autopay cost $140 per month through T-Mobile, whereas they cost $195 per month through Verizon.[25]

- Netflix is "[i]ncluded" through T-Mobile, whereas it costs $10 per month through Verizon. In fine print below this cost in the Verizon column, the calculator reads, "Optional Netflix & Max (With Ads) bundle."[26]

- Apple TV costs $3 per month through T-Mobile, whereas it costs $15 per month through Verizon. In fine print below this cost in the Verizon column, the calculator reads, "Optional Apple One bundle."[27]

---

[23] Clark Decl. (Dkt 14) ¶ 18 (emphasis added).

[24] *Id.* ¶¶ 17-18, 20; Ballard Decl., Exs. A-D (Dkts 13-1-4); Simon Decl., Ex. 1 (Dkt 23-1); Green Decl., Ex. C (Dkt 29-3); Green Decl., Exs. A-B (Dkts 39-1-2).

[25] Ballard Decl., Ex. C (Dkt 13-3).

[26] *Id.*

[27] *Id.*

7

- Hulu is "[i]ncluded" through T-Mobile, whereas it costs $10 per month through Verizon. In fine print below this cost in the Verizon column, the calculator reads, "Optional Disney+, Hulu, ESPN+ (With Ads) bundle."[28]

- T-Satellite is "[i]ncluded" through T-Mobile, whereas it costs $30 per month through Verizon.[29] This cost represents the price T-Mobile charges to Verizon customers for T-Satellite.[30] In fine print below this cost in the Verizon column, the ad reads, "Add T-Satellite—auto connects, powers your apps."[31]

- T-Mobile's "[p]rice guarantee" lasts for five years, whereas Verizon's lasts for only three years.[32]

Adding up these purported costs, T-Mobile's calculator purports to show that its Better Value Plan costs customers $143 per month, whereas Verizon's supposedly comparable Unlimited Ultimate Plan costs customers $260 per month.[33] This corresponds to $1,716 per year for T-Mobile's Better Value Plan and $3,120 per year for Verizon's Unlimited Ultimate Plan, a difference of $1,404 per year.

*Verizon's "Better Deal" Ad Campaign*

Like T-Mobile, Verizon also has claimed in ads that its service is cheaper than those of its competitors. In its current "Better Deal" campaign, Verizon claims that customers can "[s]ave

---

[28] *Id.*

[29] *Id.*

[30] Mar. 11, 2026 Prelim. Inj. Hr'g Tr. at 113:24-115:14.

[31] Ballard Decl., Ex. C (Dkt 13-3).

[32] *Id.*

[33] *Id.*

8

up to $420 [per year versus] T-Mobile or AT&T [w]hen [they] add optional streaming services and trade in a select old, broken phone."[34]  Until at least January 26, 2026, Verizon presented online an interactive calculator – or "competitive grid" – demonstrating how customers supposedly could "[d]o the math and see for [themselves]" how much they could save by switching to Verizon.[35] Verizon's competitive grid allowed customers to toggle adding to their plan certain features, such as streaming bundles, that Verizon offers and then purported to show what a T-Mobile or AT&T customer purportedly would have to pay to obtain those same benefits.[36]

*Prior Proceedings*

On February 4, 2026, Verizon filed this action and shortly thereafter moved for a preliminary injunction.  It claims that T-Mobile has engaged in false advertising in violation of the Lanham Act,[37] in deceptive and unfair trade practices under New York state law,[38] and in unfair competition under the common law.

Verizon alleges that T-Mobile's "Save Over $1,000" campaign is false for two reasons that are relevant here.  First, the campaign compares the promotional rate T-Mobile charges to new customers to Verizon's nonpromotional rate, ignoring Verizon's promotional rate of $175

---

[34]     Cohen Decl., Ex. 1 (Dkt 38-1).

[35]     *Id.*, Ex. 4 (Dkt 38-4); Mar. 10, 2026 Prelim. Inj. Hr'g Tr. at 59:8-10.

[36]     Cohen Decl., Ex. 4 (Dkt 38-4).

[37]     15 U.S.C. § 1125(a).

[38]     N.Y. Gen. Bus. Law §§ 349-50 (McKinney 2026).

per month.[39]  Second, it attributes to Verizon the costs of ancillary benefits that T-Mobile includes in its plan without charging T-Mobile the costs of ancillary benefits Verizon includes in its plan.[40]

T-Mobile's answer includes a counterclaim.  It alleges that Verizon's "Better Deal" campaign is false and misleading and therefore violates the Lanham Act and New York state law. Unlike Verizon, however, T-Mobile has not moved for a preliminary injunction.

The Court conducted a two-day evidentiary hearing with respect to Verizon's motion for a preliminary injunction.  This decision embodies the Court's findings of fact and conclusions of law.

### *Discussion*

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest."[41] The Court addresses each factor in order, taking together the last two.

---

[39]  Clark Decl. (Dkt 14) ¶ 22.

[40]  T-Mobile attributes to Verizon a cost of $10 per month for Netflix without attributing to itself the cost of HBO ($10.99 per month). *Id.* ¶ 23.  T-Mobile attributes to Verizon a cost of $15 per month for Apple TV, but it does not charge itself anything for Apple Music, Apple Arcade, or Apple iCloud storage, all of which Verizon bundles with Apple TV (collectively, $19.95 per month). *Id.* ¶ 24.  T-Mobile finally attributes to Verizon a cost of $10 per month for Hulu, but it does not charge itself anything for Disney+ or ESPN+, both of which Verizon bundles with Hulu (collectively, $19.99 per month). *Id.* ¶ 25.

[41]  *Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008).

*Likelihood of Success on the Merits*

To obtain a preliminary injunction, a movant need not show that success on the merits "is an absolute certainty. [It] need only make a showing that the probability of [it] prevailing is better than fifty percent."[42]  Nor must it show that it is likely to succeed on the merits of all asserted claims so long as it shows a likelihood of success on at least one claim that would entitle it to the relief sought.[43]

"To prevail on a Lanham Act false advertising claim, a plaintiff must establish that the challenged message is (1) either literally or impliedly false, (2) material, (3) placed in interstate commerce, and (4) the cause of actual or likely injury to the plaintiff."[44]  Injury and causation are presumed where the plaintiff is in direct competition with the defendant and the defendant's advertisement likely is false and implicates the plaintiff.[45]

There is no dispute here that T-Mobile has placed its "Save Over $1,000" campaign in interstate commerce to compete against Verizon's services.  If Verizon has proven that the campaign likely is false, the injury and causation requirements would be satisfied.  T-Mobile

---

[42]  *Eng v. Smith*, 849 F.2d 80, 82 (2d Cir. 1988) (quoting *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruled on other grounds*, *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987)).

[43]  *See Red Earth LLC v. United States*, 657 F.3d 138 (2d Cir. 2011) (per curiam) (affirming grant of preliminary injunction despite district court finding that plaintiffs were unlikely to prevail on most claims).

[44]  *Church & Dwight Co., Inc. v. SPD Swiss Precision Diagnostics, GmBH*, 843 F.3d 48, 65 (2d Cir. 2016).

[45]  *Souza v. Exotic Island Enters., Inc.*, 68 F.4th 99, 119 (2d Cir. 2023); *Merck Eprova AG v. Gnosis S.p.A.*, 760 F.3d 247, 251 (2d Cir. 2014).

contends that the campaign is neither false nor misleading and, even if it were, Verizon cannot prove that it is material.

*Falsity*

To establish falsity under the Lanham Act, a plaintiff must show that the "advertising is literally false as a factual matter" or, if literally true, that "it is likely to deceive or confuse customers."[46]  "Where the advertising claim is shown to be literally false, the court may enjoin the use of the claim 'without reference to the advertisement's impact on the buying public.'"[47]  A statement may be literally false by necessary implication "[i]f the words or images, considered in context, necessarily and unambiguously imply a false message."[48]  But, "if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally

---

[46]

*Nat'l Basketball Ass'n v. Motorola, Inc.*, 105 F.3d 841, 855 (2d Cir. 1997) (quoting *Lipton v. Nature Co.*, 71 F.3d 464, 474 (2d Cir. 1995)).

[47]

*McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1549 (2d Cir. 1991) (quoting *Coca-Cola v. Tropicana Prods., Inc.*, 690 F.2d 312, 317 (2d Cir. 1982)).

If the plaintiff does not prove literal falsity, the court "must look to consumer data to determine what 'the person to whom the advertisement is addressed find[s] to be the message.'" *Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 158 (2d Cir. 2007) (quoting *Am. Home Prods. Corp. v. Johnson and Johnson*, 577 F.2d 160, 166 (2d Cir. 1978)) (alteration in original).  "It is not for the judge to determine, based solely upon his or her own intuitive reaction, whether the advertisement is deceptive." *Johnson & Johnson * Merck Consumer Pharmas. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992).  "Alternatively, courts have allowed implied falsity to be supported by evidence that the defendant intended to deceive the public through 'deliberate conduct' of an 'egregious nature,' in which case a rebuttable presumption of consumer confusion arises." *Church & Dwight*, 843 F.3d at 65 (quoting *Merck Eprova*, 760 F.3d at 255-56).

[48]

*Time Warner Cable*, 497 F.3d at 148.

false."[49]  In *Avis Rent A Car System, Inc. v. Hertz Corp.*,[50] Judge Friendly, relying on other Second Circuit precedent, instructed courts evaluating claims of literal falsity to "consider the advertisement in its entirety and not . . . engage in disputatious dissection."[51]  As with "any task of interpretation," Judge Friendly wrote, context, more so than text, is "[f]undamental."[52]  What matters is what a reasonable customer would understand the advertisement to mean.[53]

T-Mobile's "Save Over $1,000" campaign necessarily implies that customers can save over $1,000 per year *on a comparable plan* by switching from Verizon's Unlimited Ultimate Plan to T-Mobile's Better Value Plan.  That is the substance of T-Mobile's top-line claim and disclaimers in its advertisements, and conveying that message is T-Mobile's intent in airing the campaign.[54]  That message is false.  Instead of putting comparable plans side-by-side, T-Mobile engages in an apples-to-oranges comparison at every step of the way.

The falsity of T-Mobile's comparison is apparent even in its most detailed promotional material: the calculator.  There, T-Mobile – without disclosing that it is doing so – first compares Verizon's *nonpromotional* rate ($195 per month) with its own *promotional* rate ($140 per month).  It attempts to define away that problem by arguing that "$140 for three lines is the standard

---

[49]      *Id.* at 158.

[50]      782 F.2d 381 (2d Cir. 1986).

[51]      *Id.* at 385 (quoting *FTC v. Sterling Drug, Inc.*, 317 F.2d 669, 674 (2d Cir. 1963)) (omission in original).

[52]      *Avis Rent A Car*, 782 F.2d at 385.

[53]      *Zesty Paws LLC v. Nutramax Labs., Inc.*, 157 F.4th 194, 198 (2d Cir. 2025).

[54]      *See* Mar. 11, 2026 Prelim. Inj. Hr'g Tr. at 130:13-23.

rate for T-Mobile's Better Value [P]lan."[55]  But that is the case because the Better Value Plan *itself* is a limited-time, promotional plan.  Comparing a nonpromotional plan to a promotional plan is akin to comparing an apple to an orange.[56]  They simply are different things.

T-Mobile nevertheless maintains that its comparison is "reasonable" because it "targets *existing* Verizon customers," who supposedly would not be "eligible for Verizon's promotional price."[57]  But nowhere in the campaign does T-Mobile indicate that it is speaking to only the subset of Verizon customers who are paying Verizon's nonpromotional rate.  Certainly T-Mobile's use of the term "switch" in the campaign fails to convey that the advertised claims are inapplicable to Verizon customers who are paying Verizon's promotional rate, which lasts for three years.[58]

T-Mobile then compares the price for each of three streaming services that it includes at little to no additional cost in its Better Value Plan to the full cost of each of Verizon's bundles that include the relevant streaming service.  Yet, T-Mobile neither credits Verizon for the value of the additional services included in Verizon's bundles nor charges T-Mobile for those services, which are not available through the Better Value Plan.  It charges Verizon for the "sticker price" of T-

---

[55]  Def.'s Post-Hr'g Mem. Law (Dkt 45) at 6.

[56]  *See Doctor's Assocs., Inc. v. QIP Holder LLC*, No. 6-cv-1710, 2010 WL 669870, at \*15-19 (D. Conn. Feb. 19, 2010) (finding genuine issue of material fact with respect to falsity of Quiznos' claim that its sandwiches had "twice the meat" of Subway's sandwiches when Quiznos had designed sandwiches to contain over twice the weight of meat despite customers' ability to order sandwiches with double meat from Subway for less money than what Quiznos' default sandwiches costed).

[57]  Def.'s Post-Hr'g Mem. Law (Dkt 45) at 7.

[58]  Mar. 11, 2026 Prelim. Inj. Hr'g Tr. at 111:6-112:16.

14

Satellite too, notwithstanding the facts that only T-Mobile offers T-Satellite, that T-Mobile controls how much to charge Verizon customers for T-Satellite, and that most Verizon customers do not purchase T-Satellite.

T-Mobile defends this choice on the ground that it should not be forced to use Verizon's "preferred inputs" when making a price comparison to the service it offers.[59]  But that misses the point.  So too does T-Mobile's argument that the campaign cannot be literally false because it discloses its "inputs" and "methodology."[60]  T-Mobile and Verizon have chosen to price differently the ancillary services they offer as well as to make available different ancillary services through their respective plans.  In other words, the plans they offer – their products, so to speak – are different.  Thus, the point remains that the services "are not actually comparable,"[61] yet T-Mobile nonetheless portrays them as equivalents in all ways other than in price.  Indeed, that T-Mobile's supposedly comparable plan is "cheaper" is the very impression T-Mobile seeks to create – what it calls the "so what" of its campaign.[62]  Sending that message is like advertising an apple as equivalent to an orange in all ways except price.  Such an advertisement would be "literally false

---

[59]  Def.'s Post-Hr'g Mem. Law (Dkt 45) at 9.

[60]  *Id.*

[61]  *See also Chlorox Co. v. Reckitt Benckiser Grp. PLC*, 398 F. Supp. 3d 623, 638 (N.D. Cal. 2019) (holding literally false an advertisement portraying Clorox and Lysol products as comparable in effectiveness while hiding "differences in positioning, formulation[,] and intended purpose").

[62]  Mar. 11, 2026 Prelim. Inj. Hr'g Tr. at 130:13-23.

15

by necessary implication" because it would portray "non-comparable products . . . as otherwise equivalent (except for the superior or inferior aspect being illustrated in the advertisement)."[63]

Comparing T-Mobile's Better Value Plan and Verizon's Unlimited Ultimate Plan in this apples-to-oranges way is the only way to substantiate T-Mobile's top-line claim that customers can save over $1,000 per year by switching to T-Mobile.  Accounting for Verizon's promotional rate and the ancillary streaming benefits it offers in its bundles that T-Mobile does not and removing from Verizon's side of the figurative ledger the cost of T-Satellite, the supposed savings fall to a mere $228.84 per year.[64]  Even adding back one of T-Mobile's claimed savings on streaming or T-Satellite would not push the possible savings back above $1,000 per year.[65]  T-Mobile's claim that customers can save over $1,000 per year on a comparable plan by switching from Verizon to T-Mobile "is arithmetically unattainable unless T-Mobile fabricates costs, ignores promotions, or assigns invented values to optional benefits and niche features."[66]

Finally, the campaign includes a price guarantee of five years.  In reality, however, the price guarantee applies to only "the cost of voice, data, and texting on T-Mobile's cellular

---

[63]   *Guardant Health, Inc. v. Natera, Inc.*, No. 21-cv-4062, 2025 WL 2106522, at *3 (N.D. Cal. July 28, 2025) (quoting *Clorox*, 398 F. Supp. 3d at 637); *see also Groupe SEB USA, Inc. v. Euro-Pro Operating LLC*, 774 F.3d 192, 202 (3d Cir. 2014) (affirming district court's finding of literal falsity with respect to claim that iron produced the "most powerful steam" because more expensive iron delivered more powerful steam).

[64]   Clark Decl. (Dkt 14) ¶ 27.

[65]   *See id.*

[66]   Pl.'s Mem. Law (Dkt 15) at 14.

16

network," or "the price of the rate plan."[67]  It does not extend to the ancillary streaming benefits or T-Satellite.[68]  In other words, even assuming the accuracy and truthfulness of T-Mobile's "preferred inputs," its top-line claim of saving over $1,000 per year would be guaranteed for only as long as it would choose to keep its ancillary streaming benefits and T-Satellite service priced the same. There would be no guarantee that the claimed savings – again assuming they were even attainable – would last for one year, let alone five.  To the extent that T-Mobile discloses that crucial fact in the campaign, it does so at best indirectly, in fine print, and only on some advertisements.[69]  Such a disclaimer is insufficient to alter the unmistakable message of the campaign that a customer can save over $1,000 per year by switching to T-Mobile.[70]  Because the guarantee, "on its face, conflicts with . . . the reality it purports to describe," it is literally false.[71]

*Materiality*

A plaintiff asserting a claim of false advertising under the Lanham Act must show also that the false assertion is material – i.e., that the defendant misrepresented an inherent quality

---

[67]  Mar 11, 2026 Prelim. Inj. Hr'g Tr. at 129:12-18.

[68]  *See id.*

[69]  *See* Simon Decl., Ex. 1 (Dkt 23-1) at 2 ("5-Year Price Guarantee: Guarantees monthly price of on-network talk, text & 5G data on a Better Value plan."); *accord* Green Decl., Ex. C (Dkt 29-3); J. Ex. 17, at 3.

[70]  *See JR Tobacco of Am., Inc. v. Davidoff of Geneva (CT), Inc.*, 957 F. Supp. 426, 437 (S.D.N.Y. 1997) ("[A] disclaimer is ineffective to cure a literally false statement."); *Weight Watchers Int'l, Inc. v. Stouffer Corp.*, 744 F. Supp. 1259, 1276 (S.D.N.Y. 1990); *Am. Home Prods. Corp. v. Johnson & Johnson*, 654 F. Supp. 568, 590 (S.D.N.Y. 1987).

[71]  *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 229 (2d Cir. 1999).

or characteristic of the advertised product.[72]  Doing so requires the plaintiff to demonstrate that the false representation is "likely to influence purchasing decisions."[73]  Materiality generally is satisfied "where the defendant and plaintiff are competitors in the same market and the falsity of the defendant's advertising is likely to lead consumers to prefer the defendant's product over the plaintiff's."[74]

Here, T-Mobile and Verizon compete in the cellular service market, and T-Mobile's campaign unambiguosly messages – as it is intended to – that its service is cheaper, and thus superior, to Verizon's "comparable" service.  Claiming a price difference between two purportedly comparable products is material.[75]  Indeed, T-Mobile's claim of immateriality is nonsense for the obvious reason that it is inconsistent with its decision to launch the campaign[76] and with its repeated arguments that enjoining the campaign would harm its ability to communicate the value of its services and compete in the cellular service market.  If the claim that T-Mobile is cheaper than the allegedly comparable product from Verizon is immaterial to consumers, there would be no point in making the claim in the first place.

---

[72] *Merck Eprova*, 760 F.3d at 256.

[73] *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 63 (2d Cir. 2016).

[74] *Church & Dwight*, 843 F.3d at 70-71.

[75] *Insurent Agency Corp. v. Hanover Ins. Co.*, No. 16-cv-3076, 2018 WL 3979589, at *6 (S.D.N.Y. Aug. 20, 2018) ("[T]hat [d]efendants misrepresented the price difference between [plaintiff]'s and [defendants'] products[] clearly meets the materiality requirement.").

[76] *See Conopco Inc. v. Wells Enters., Inc.*, No. 14-cv-2223, 2015 WL 2330115, at *5 (S.D.N.Y. May 14, 2015) ("[Defendant]'s own decision to highlight the word 'original' on its packaging, at the forefront of the box and as the largest word other than the product's name, suggests the relative importance, and hence materiality, of the claim to originality in its marketing of [the product].").

18

\*                    \*                    \*

Competition in the cellular service market is intense and in some ways zero-sum. Each provider wants for itself as many customers as it can get. Customer attention thus is a commodity and a fleeting one at that. When a provider has it, it seeks to capitalize on it. Advertisements get faster, flashier, and (sometimes) funnier. But this legitimate competition and innovation cannot come at the expense of truthfulness and accuracy. Advertisements cannot be false, literally or by necessary implication. Because there is no way a customer could save over $1,000 per year on a comparable plan by switching from Verizon to T-Mobile and because making such a claim materially harms Verizon, the Court, at least at this preliminary stage, concludes that Verizon is likely to succeed on the merits of its Lanham Act claim.

*Irreparable Harm*

On a motion for a preliminary injunction to prevent a violation of the Lanham Act, a plaintiff is "entitled to a rebuttable presumption of irreparable harm . . . upon a finding of likelihood of success on the merits for a violation."[77]

Verizon has shown that it is likely to succeed on the merits of its Lanham Act claim, so it is entitled to a presumption of irreparable harm. T-Mobile argues that presumption has been rebutted by what it describes as "Verizon's delay in filing suit."[78] But there has been no such delay. Verizon and T-Mobile have been engaged in an ongoing dispute before self-regulatory bodies in the advertising industry over the last couple of years in which Verizon has asserted *similar claims*

---

[77]    15 U.S.C. § 1116(a).

[78]    Def.'s Post-Hr'g Mem. Law (Dkt 45) at 22.

19

against T-Mobile in the context of a *different ad campaign.* When T-Mobile launched the "Save Over $1,000" campaign at issue here, Verizon promptly filed suit and sought a preliminary injunction. The presumption of irreparable harm to Verizon remains.

*The Balance of Equities and the Public Interest*

T-Mobile offers three reasons for why the equities and the public interest supposedly weigh against issuing a preliminary injunction. First, T-Mobile argues that Verizon has engaged in substantially similar advertising in the past, including up until ten days before Verizon brought this action. Second, T-Mobile points to its having stopped airing one of the challenged advertisements "for business reasons."[79] Third, T-Mobile asserts that an injunction here "would strip T-Mobile of the same building blocks that are standard in the industry" and distort legitimate competition.[80] None of these reasons carry the water T-Mobile hopes they do.

The equitable defense of unclean hands is available to defendants in Lanham Act cases.[81] But, as always, the doctrine is applied narrowly and "only where some unconscionable act of one coming for relief has immediate and necessary relation to the equity that [it] seeks in respect of the matter in litigation."[82]

---

[79] Mar. 11, 2026 Prelim. Inj. Hr'g Tr. at 116:22-24, 121:20-122:3.

[80] Def.'s Post-Hr'g Mem. Law (Dkt 45) at 23.

[81] *Warner Bros., Inc. v. Gay Toys, Inc.*, 724 F.2d 327, 334 (2d Cir. 1983).

[82] *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933); *accord Stokely-Van Camp, Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 533 (S.D.N.Y. 2009).

At least at this preliminary stage, the Court assumes without deciding that Verizon's "Better Deal" campaign, particularly its competitive grid, was flawed as T-Mobile alleges. To be clear, the Court in no way suggests that Verizon's hands are clean. Nevertheless, the doctrine of unclean hands should not apply here. Verizon took down its competitive grid before initiating this action. Its position "must be judged by the facts existing as they were when this suit was begun, not by the facts existing in an earlier time . . . . Conduct which came to an end prior to the events which are in issue cannot constitute an unclean hands defense."[83] Even if that were not the case, it still would be "better to remedy one wrong than to leave two wrongs at large,"[84] particularly where the harm damages not just the parties but also the public.[85] The solution to inequitable conduct is to file a counterclaim – as T-Mobile has done – or bring a separate action,[86] not to allow all such deceptive conduct to continue.

T-Mobile's second and third arguments on the equities and the public interest are equally devoid of merit. Although T-Mobile has modified its campaign, such as by ceasing to air a particular ad, the modified campaign remains in use nationwide. Furthermore, absent action by this Court, nothing would prevent T-Mobile from starting to air again the voluntarily retracted ad.[87]

---

[83] 4 McCarthy on Trademarks and Unfair Competition § 31:55 (5th ed. 2026).

[84] *Id.* § 31:53.

[85] *Bell v. Streetwise Records, Ltd.*, 761 F.2d 67, 76 (1st Cir. 1985) (Coffin, J., Breyer, J., concurring) (rejecting unclean hands defense despite potential fairness to parties because of public interest in correcting consumer confusion).

[86] 4 McCarthy § 31:55.

[87] *See also FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311, 320 (S.D.N.Y. 2001) (LAK) (discussing doctrine of voluntary cessation).

21

Finally, enjoining claims that are false would neither chill legitimate advertising nor stifle fair competition.[88] Though issuing an injunction may cause T-Mobile some pocketbook and reputational injury, it would promote truthful and accurate advertising, which undoubtedly would serve the public interest by ensuring that what consumers see is what they get.[89]

*Bond*

A preliminary injunction may not issue unless the moving party "gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined."[90] Whether to require security at all, however, depends on the specific circumstances of the case and rests squarely in the discretion of the court.[91] Indeed, waiving the bond requirement may be appropriate in "cases involving the enforcement of 'public interests,'" even where the movant is pursuing also its own pecuniary interests.[92] The "central consideration

---

[88] Mar. 11, 2026 Prelim. Inj. Hr'g at 120:16-121:6.

[89] *Id.* at 130:24-131:18; *see Nike, Inc. v. Rubber Mfrs. Ass'n, Inc.*, 509 F. Supp. 919, 926 (S.D.N.Y. 1981) (crediting public interest in being free from false advertisements); *Gen. Mills, Inc. v. Chobani, LLC*, 158 F. Supp. 3d 106, 121 (N.D.N.Y. 2016) ("It is self-evident that preventing a false or misleading advertising is in the public interest.").

[90] Fed. R. Civ. P. 65(c).

[91] *State Farm Mut. Auto. Ins. Co. v. Tri-Borough NY Med. Prac. P.C.*, 120 F.4th 59, 86 (2d Cir. 2024).

[92] *Pharma. Soc'y of N.Y., Inc. v. N.Y. Dep't of Soc. Servs.*, 50 F.3d 1168, 1174 (2d Cir. 1995).

22

in determining whether the bond requirement should be waived" is the "nature of the rights being enforced, rather than the nature of the entity enforcing them."[93]

Here, Verizon seeks to enjoin T-Mobile from engaging in false advertising. A preliminary injunction necessarily would be in the public interest. The amount of security that is appropriate under Rule 65(c) therefore is nothing.

### *Conclusion*

For the foregoing reasons, Verizon is entitled to a preliminary injunction enjoining T-Mobile's "Save Over $1,000" campaign.[94] Verizon's motion for a preliminary injunction (Dkt 22) is granted to the extent set forth in the form of Preliminary Injunction filed today. It otherwise is denied.

SO ORDERED.

Dated:        March 30, 2026

_____
Lewis A. Kaplan
United States District Judge

---

[93]     *Id.* at 1175.

[94]     Because Verizon is entitled to the relief it seeks based on only its Lanham Act claim and its state law and common law claims would require additional evidentiary showings, *see Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (per curiam) (elements of a General Business Law Section 349 or 350 claim); *C=Holdings B.V. v. Asiarim Corp.*, 992 F. Supp. 2d 223, 244 (S.D.N.Y. 2013) (Sullivan, J.) (elements of an unfair competition claim), the Court need not and does not address whether Verizon could obtain a preliminary injunction based on its state law and common law claims too.